MOORE *v.* ADAMS.

4-5999                                141 S. W. 2d 46

Opinion delivered June 10, 1940.

*Price Dickson,* for appellants.

*Rex W. Perkins,* for appellees.

SMITH, J. Mrs. Wahneetah Clark Ingalls acquired title in 1926 to a tract of land adjoining, but outside of the limits of the City of Fayetteville which she subdivided into four blocks with intervening streets. Three of these blocks contained 20 lots each; the fourth block contained 11 lots, making a total of 71 lots. She filed a dedicatory plat of the survey showing the location of the lots with reference to the streets, but she filed no bill of assurance reserving the lots for any particular or special use or purpose. There was testimony to the effect that the property was well adapted to residential purposes, and that it was generally understood that she intended this subdivision to be a restricted residential section.

Mrs. Ingalls has now sold all these lots, as is evidenced by fifteen separate deeds executed by her. The first deed, dated September 7, 1926, contained no restrictions. The second deed restricted the use of the

lots sold to residential purposes, but contained no limitation as to cost of the residences. The third deed contained the restriction that no building should be erected on the lots costing less than $3,500. The fourth deed restricted the use of the lots sold to residential purposes only without limitation as to cost, as did the fifth deed also. The sixth deed provided that no building should be erected at a less cost than $3,500. The seventh and eighth deeds contained no restrictions. The ninth deed contained a building restriction reading as follows: "It is hereby agreed and understood that the grantee or his heirs or assigns, will not use said lots except for residence purposes, and not to place a building on said lots to cost less than $3,500 and not to sell said lots to persons of negro blood."

The tenth deed contained the restriction that no house should be erected at a less cost than $3,500. This restriction reads as follows: "It is agreed and understood that the grantee or his heirs or assigns will not erect a house to cost less than $3,500 and that he will not sell or convey said premises to people of negro blood."

The eleventh deed contained the restriction that no building should be erected to cost less than $3,500. The twelfth, thirteenth and fourteenth deeds contained a restriction that only dwellings should be erected, none to cost less than $3,500.

No further deeds were executed until May 6, 1933, at which time all the remaining lots were conveyed in a single deed without restrictions as to use of lots or cost of buildings to be erected thereon.

The clerk and ex-officio recorder of the county and an abstracter of land titles who had examined the records of these deeds summarized them as follows: Three deeds, conveying 8 lots, restricted the use of the lots to residences. Four deeds, conveying 47 lots, contained no restrictions. Three deeds, conveying 4 lots, provided that no building should be erected to cost less than $3,500. One deed, conveying 4 lots, provided that no house should be erected to cost less than $3,500, and four other

deeds, conveying 8 lots, provided that no dwelling should be erected to cost less than $3,500.

Only two of the lots in block 1 (4 and 5) contained restrictions as to residences costing not less than $3,500. There appears, therefore, to be an entire absence of any general plan in the restrictions upon the use of the lots comprising this subdivision. The title to all the lots comprising it has passed from Mrs. Ingalls.

One of the deeds executed by Mrs. Ingalls, dated November 5, 1926, was to Mozelle Davis. This deed conveyed lots 6, 7, and 8, in block 1, and contained a restrictive clause reading as follows: "It is agreed and understood that the grantee, or his heirs or assigns, will not erect a house to cost less than $3,500, and that he will not sell or convey said premises to people of negro blood." The lands conveyed to Davis are adjacent to lots 4 and 5, block 1, the deed to which last-mentioned lots contained a clause restricting their use to dwellings costing not less than $3,500.

Davis conveyed lots 6, 7, and 8, block 1, to Elmer E. Moore, who proposes to erect a tourist camp thereon. A blueprint of the camp which Moore proposes to erect shows that it will be a single building, consisting of six units, and it is not questioned that its cost will be $4,056, and Moore testified that he expected to expend $6,500 for building, landscaping and fixtures. He does not propose to operate a filling-station, and there will be no facilities for cooking.

This suit was filed by Mrs. J. A. Adams, Dr. J. A. Williams, and Dr. Benjamin Ward, all of whom had purchased lots in Wahneetah Subdivision, to restrain Moore from the erection of this building as a tourist camp, and from a decree granting that relief is this appeal.

The testimony on behalf of the plaintiffs is to the effect that the erection of this tourist camp building will depreciate the value of the lots owned by plaintiffs and of all other lots in the subdivision. Without reviewing this testimony, we announce the conclusion that the find-

ing that this will be the effect of the erection of the tourist camp does not appear to be against the preponderance of the evidence.

It appears that the streets laid off in the dedicatory plat of the survey of the subdivision have not been improved, and it appears also that only three houses and one green house have been erected in this subdivision. One of these houses is referred to as the Adams property, being lots 4 and 5, block 1. Roy Adams testified that his father, now deceased, built a house on these lots, in which his mother now resides, which cost between five and six thousand dollars. He admits that his father also built a green house on these lots, but he called this only a temporary structure, and testified that only ten per cent. of it was now used as a green house. This green house covers three-fourths of a lot, was erected in 1931 or 1932, and some use of it as such has since been continuously made. Adams admitted that the green house has a stone and cement foundation and steel frames for the glass, a dirt floor with concrete ramp 4 to 6 feet wide to walk on, and that the building will last as long as any green house. Building contractors testified that the green house is a permanent structure, and we think it conclusive that this is a permanent building, and is not a residence, although erected upon lots containing the restrictive clause that only dwellings costing not less than $3,500 should be erected thereon.

Lloyd Harness is the owner of one of the three residences on the property. He testified that he did not know when he bought his property that it was in a restricted area, but had since learned that it is. He did not know what his home had cost, but he did not think it could be replaced for less than $3,500. A building contractor testified that the construction cost of this building would be about $3,000.

Dr. Ward is the owner of another of these houses. He purchased his lot from George Lee, who built the house thereon. He paid $2,000 for the property. He knew this was a restricted area, but did not know he

had to meet requirements on the house. Lee, who was Ward's grantor, testified that the purchase price of the house and lot was $2,800, that the house was contracted for $2,000, but the contractor did not do a good job and he was required to spend $351 additional, and that the total cost was around $2,500.

Dr. Williams testified that he had not yet built, but intended to erect a $3,500 house, which, in his opinion, would be depreciated from 50 to 75 per cent., if a tourist camp were erected in the neighborhood.

Other owners who had bought lots, but had not built, expressed the opinion that the erection of the tourist camp would greatly depreciate their property.

Summarizing this testimony, it may be said. The subdivision is not affected by any zoning ordinance. There was filed with the plat of the survey no bill of assurance restricting the use of the property. The deeds from the grantor, Mrs. Ingalls, indicate an entire absence of any general plan in imposing building restrictions. Except only as to the Adams property, there has been no compliance with the restrictions imposed as to cost of building, and it is upon this Adams property that the green house was constructed. There are no other developments in this subdivision.

For the reversal of the decree restraining Moore from building a tourist camp on his property, it is submitted that fourteen years have elapsed since the first restrictions were imposed, and that subsequent restrictions have been imposed at random on only a part of the lots, and that all the development of the property has been in violation of the restrictions, with no one insisting upon their enforcement and that, for these reasons, the restrictions have been abandoned.

Opposed to this view is the insistence that the subdivision is peculiarly adapted to the establishment of a restricted residential section on account of its location and the elevation of the land, and that the witnesses who purchased one or more of the lots understood that the entire subdivision was a restricted residential section.

However that may be, it is beyond the power of courts to establish restricted districts. That can only be done by the owner of the land in a manner authorized by law. Such restrictions cannot be imposed by proof of the suitability of the land to the restricted purpose, nor by "a general belief" or "a common understanding" that it had been so restricted. The restrictions must have a contractual basis, arising out of a contract imposing upon grantor and grantee alike the obligation to observe the restrictions.

The ordinary method of establishing restricted districts when new subdivisions are surveyed and platted is to file with the dedicatory plat of the survey a bill of assurance, whereby the owner of the land platted obligates himself not to convey except in conformity with the restrictions imposed in the bill of assurance. The courts uniformly hold that such assurance induces purchases of the restricted property, and that the purchasers are entitled to have this reciprocal obligation enforced. Such a contract was enforced by this court in the case of *Dillingham* v. *Kahn*, 188 Ark. 759, 67 S. W. 2d 735. There, the owner of a subdivision filed with the plat thereof a bill of assurance that no residence should be erected the actual cost of which was less than $10,000. The owner of the subdivision erected a house in the restricted area at the contract cost of $7,750. Proof of this fact being made, it was held that a purchaser of one of these lots could rescind the purchase contract and recover the purchase money since covenants for payments and restrictions were concurrent and dependent.

The theory upon which these restrictions are imposed is that one taking title to land with notice that it is subject to an agreement restricting its use will not, in equity and good conscience, be permitted to violate its terms.

It is not essential, however, that there be a bill of assurance filed with the plat of the subdivision. The restricted use may be annexed to the conveyance of the land, and some of the cases on the subject have arisen

out of an agreement between adjoining owners as regards the use of their land. . Chapter on Equitable Restrictions, 3 Tiffany Law of Real Property, (3rd Ed.) § 858. This edition of this great textbook is one of the latest works on the subject, and the chapter on Equitable Restrictions reviews and cites the latest cases, and in the section just cited the law is said to be that "The courts do not favor restrictions upon the utilization of land, and that a particular mode of utilization is excluded by agreement must clearly appear."

It is pointed out that in the deed to Moore's grantor the only restriction imposed is that it shall not be conveyed to persons of negro blood, and that the house to be built thereon shall cost not less than $3,500. Moore is not·threatening to convey to a person of negro blood, and proposes to build a house which will cost more than $3,500. The restriction is not as to the use of the house, but only as to its cost. The house which Moore proposes to build will consist of six units or rooms.

It is said, however, that Moore was advised that it was the purpose of Mrs. Ingalls to make this subdivision strictly and exclusively a residential section, and that he knew this fact, and knew that the word "house", used in the deed to his grantor was intended to mean a dwelling-house. This may be true, but, even so, injunctive relief must be denied for another reason.

Building restrictions may be imposed and enforced, but their enforcement may be so relaxed that they will be said to have been abandoned. It is said in the chapter on Equitable Restrictions, above referred to, that. in the absence of a provision to the contrary, the right to enforce a restrictive agreement may be lost by laches or acquiescence, and at § 873 of this chapter it is said: "One can not obtain relief in equity against the violation of a restrictive agreement entered into in pursuance of a general plan if he, himself, is guilty of a substantial breach of the same restriction. Nor will the violation of a restriction be enjoined where it has been disregarded by the property owner seeking the injunction as. well

as by other property owners generally, even though their infringements of the restriction have not been to the extent of the one against which injunction is sought."

At § 468 of the chapter on Deeds in 18 C. J., p. 402, it is said: "Where restrictions have been imposed according to a general plan, one of the grantees of lots subject thereto, who has himself violated such restrictions, will not be heard to complain against similar violations by other grantees, although such violations are greater in extent than his own; but it has been held that where both parties have been guilty of similar violations of a restriction, one may complain of a further and more extensive violation by the other."

Here, as has been shown, there was no general plan, but, if there had been, it has not been pursued. The parties here complaining of its violation have themselves violated the general plan in the respects herein stated, and they are in no position to complain. Mrs. Ingalls does not complain, nor is she in position to do so, as she has, herself, conveyed the major portion of the lots in this subdivision by deeds containing no restrictions whatever. If the owners of lots who have not built dwellings thereon and who have not joined in this suit feel that the covenants contained in their deeds from Mrs. Ingalls have been breached, they may ask the relief accorded Dillingham in the case of *Dillingham* v. *Kahn, supra,* if they prove their case.

Some of the witnesses who testified in this case based their objection to the erection of the tourist camp upon the ground that it would be a nuisance if erected. No court has ever held, so far as we are advised, that a tourist camp is a nuisance *per se.* It may be so conducted as to become one, but, if so, there is provision in the law for its abatement. Moore's building has not been erected.

We conclude, therefore, for the reasons herein stated, that it was error to have enjoined Moore from the erection of his tourist camp, and that decree will be reversed, and the cause will be remanded, with directions to dismiss the complaint praying that relief.