P.H. KNOWLES, Jr. *v.* Sam. L. ANDERSON, Sr., et al.

91-249                                    821 S.W.2d 466

Supreme Court of Arkansas
Opinion delivered December 16, 1991

*Dan McCraw*, for appellant.

*Ray Owen, Jr.*, for appellee.

DAVID NEWBERN, Justice. The principal issue in this case is whether a purchaser of land with respect to which there is no use restriction in the chain of title may be required to comply with a "general development scheme" of which he may have notice by observation of conditions surrounding his land. We hold he may not.

The appellant, P.H. "Rocky" Knowles, purchased a 2 acre lot in the rural Lakeview Subdivision of Hot Springs on February 29, 1984. His intent was to develop the lot into a mobile home park. He checked his title abstract and found no restrictions applicable to his land. In the next two years Knowles prepared the lot for mobile homes by installing sewer, power, and water lines. He then purchased and moved two mobile homes onto the lot. The evening after Knowles placed the mobile homes on the lot he received a call from one of the appellees demanding that the

mobile homes be removed as they were in violation of the residential scheme and certain restrictive covenants which had created this scheme. Upon his refusal to remove the structures a suit seeking permanent injunction against mobile homes on the property was instituted on May 16, 1986, and tried May 16, 1990.

The parties stipulated to the introduction of various instruments of record in Garland County. These included all instruments in Knowles' chain of title from the creation of the subdivision in 1942, all instruments of record which appellee's felt established restrictions prohibiting mobile homes, the original Bill of Assurance for the Lakeview Subdivision, and two deeds from the original developer, a computer printout summarizing the recorded restrictions in particular deeds, and a hand colored map which summarized the various restrictions by color coding. The parties stipulated that Knowles' property fell into an area where a home had been built on site. It was characterized by the appellees as being "effectively restricted". Knowles acknowledged that when he purchased the property there were two structures on it. One was a 50-year-old frame home which still stands, and the other was a one-bedroom cottage which was torn down. Across the street from him was property with a garage apartment in poor condition and a partially completed A-frame house. On one side of his property was completely undeveloped land and to the other side was another house similar to the one on his property. Knowles testified he had little knowledge of the kind of structures located in other parts of other surrounding subdivisions and that he felt he had no reason to look further than his own property when he checked with the abstract company to find that there were no restrictions.

Some residents of the subdivision testified on behalf of the appellees. They all had lots they felt were restricted and that there was a general development scheme for single family residential development only. They testified that they had been assured by the grantors that this scheme would continue, and they had purchased their properties in reliance on that fact.

The exhibits presented show that the original developers created at least four adjoining subdivisions: Lakewood, Lakeview, Lindale, and Bonair. Lakeview Subdivision was established June 28, 1942, with the filing of a bill of assurance. There are no

restrictions in this bill of assurance which would prohibit mobile homes. Knowles' property falls within the area covered by this bill of assurance, and none of the deeds within his chain of title, beginning with the first conveyance in 1947, contains any restriction. Lindale Subdivision was established December 14, 1959, with a bill of assurance containing restrictions prohibiting mobile homes. Bonair Subdivision, created May 31, 1961, and Lakewood Acres Subdivision, created June 12, 1961, were similarly restricted.

Knowles argued that Ark. Code Ann. § 18-12-103 (1987) prohibited enforcement of any restrictive covenant against him and denied that there was any general scheme of development. The Chancellor found that there was a general building scheme which prohibited mobile homes and that Knowles was familiar with the subdivision prior to purchasing the land. This familiarity with the area constituted implied or actual knowledge of the general plan. The Chancellor concluded that an equitable servitude had arisen which prohibited mobile homes and granted the permanent injunction.

Knowles raises two points of appeal. He challenges the finding of a restrictive covenant or equitable servitude based on a "general development plan" affecting his land, and he disputes the Chancellor's conclusion that he had notice of any such plan. We agree with Knowles' conclusion that there was no covenant or other servitude restricting his land against the placement of mobile homes, and thus we reverse the decision and dismiss the case.

## 1. Validity of the restrictions

Arkansas Code Ann. § 18-12-103 (1987) provides:

> No restrictive or protective covenants affecting the use of real property nor any instrument purporting to restrict the use of real property shall be valid or effective against a subsequent purchaser or owner of real property unless the restrictive or protective covenants or instrument purporting to restrict the use of real property is executed by the owners of the real property and recorded in the office of the recorder of the county in which the property is located.

There are restrictions in the deeds of other residents of

Lakeview Subdivision but nothing to which Knowles would have been obligated or likely to turn in researching title to the land when he was considering buying it. The Chancellor acknowledged the Statute but chose not to apply it to this case because he concluded our case law construes the requirements for establishing a restrictive covenant on the facts of each case rather on the basis of the Statute.

The decision to disregard the Statute was based on *Cook* v. *Jones*, 271 Ark. 870, 611 S.W.2d 506 (1981) and *Warren* v. *Detlefsen*, 281 Ark. 196, 663 S.W.2d 710 (1984), which the appellees cited for the proposition that this Court has recognized the imposition of restrictive covenants based on a "general plan of development" theory. While the *Cook* case involved a covenant which prohibited mobile homes, and there was only a passing reference to the predecessor Statute, it is abundantly clear that this Court's holding is consistent with the Statute.

Mr. Cook's deed contained the restriction against mobile homes. His argument to the Chancellor was that because one tract of land in the subdivision had been sold without such a restriction the restriction could not be enforced against him. The Chancellor so held, and we reversed and enforced the covenant. We discussed the concept of a general plan of development and expressed our misgivings about such a method of imposing restrictions, but ultimately we concluded that restrictive covenants of this sort have been found legal where a general plan of development exists, citing *Moore* v. *Adams*, 200 Ark. 810, 141 S.W.2d 46 (1940). Our basis for the *Cook* decision was that Cook knowingly violated the restrictions found in his deed. It is entirely consistent with the Statute and our discussion of the general plan of development in *obiter dictum* does not indicate that we had chosen to disregard it.

In the *Warren* case, we were dealing with an entirely different type of land use control. The Warrens had sold some lots in their development with single family dwelling restrictions. They later attempted to construct duplexes on some of their remaining properties in the development. We affirmed a chancellor's conclusion that a developer who sells lots with restrictive covenants for single family use in the deeds of the buyers cannot thereafter himself violate those restrictions. We held that the

equitable servitude of a reciprocal negative easement had arisen against the Warrens. Again we mentioned the general plan of development theory but did so in support of the Chancellor's admission of parole evidence to show that oral representations of a single family residential scheme had been made. The fact that representations of a general restrictive development scheme were made coupled with the restrictions shown in each of the deeds to the grantees led the Chancellor to conclude that the developer's retained land should also be restricted. As we were not concerned with a subsequent purchaser seeking to avoid a restrictive covenant of which he had no actual knowledge, there was no need to refer to the Statute. Indeed, the Statute is wholly inapplicable to a reciprocal negative easement situation, as it arises not by operation of law but as a purely equitable remedy based on the contractual relationship between the common grantor and his grantees.

The Chancellor's decision to disregard the Statute and look to cases from other jurisdictions to support his findings that the restrictive covenants in this case were valid based on a general scheme of development is not supported by the *Cook* or *Warren* decisions. The decision also ignores the rules for the establishment of restrictive covenants enunciated in *Moore* v. *Adams, supra*. There the common grantor, Mrs. Ingalls, sold a total of 71 lots in a four block area outside the City of Fayetteville. No plat or bill of assurance stating any restrictions was filed. There was testimony that the property was well adapted to residential purposes, and the deeds to eight of the lots sold restricted the property to residential use. Four deeds conveying 47 lots had no restrictions, and eight others conveying 16 lots provided a minimum cost for the building, house, or dwelling erected on the lot. The grantees whose lots were restricted sued Moore, another grantee whose deed contained no restrictions concerning what was to be placed on the lot, to restrain him from building a tourist camp. The deed to Moore's grantor had a restriction requiring that a house costing not less than a minimum amount be placed on the lot. The Chancellor granted the injunction based on testimony from the plaintiffs that a camp would greatly depreciate the value of their property and that they had understood that the entire subdivision was to be a restricted area. We reversed, finding no general scheme of development, and even if there had been such a

scheme, it had been abandoned. In discussing whether there were valid covenants we touched on the methods of establishing restrictions:

> The ordinary method of establishing restricted districts when new subdivisions are surveyed and platted is to file with the dedicatory plat of the survey a bill of assurance, whereby the owner of the land platted obligates himself not to convey except in conformity with the restrictions imposed in the bill of assurance. The courts uniformly hold that such assurance induces purchases of the restricted property, and that the purchasers are entitled to have this reciprocal obligation enforced. . . .

> The theory upon which these restrictions are imposed is that one taking title to land with notice that it is subject to an agreement restricting its use will not, in equity and good conscience, be permitted to violate its terms.

> It is not essential, however, that there be a bill of assurance filed with the plat of the subdivision. The restricted use may be annexed to the conveyance of the land, and some of the cases on the subject have arisen out of an agreement between adjoining owners as regards the use of their land. Chapter on Equitable Restrictions, 3 Tiffany Law of Real Property, (3rd Ed.) § 58. . . . [I]n the section just cited the law is said to be that "The courts do not favor restrictions upon the utilization of land, and that a particular mode of utilization is excluded by agreement must clearly appear".

The Chancellor's conclusion that a restrictive covenant may be enforced based solely on a general plan of development in the absence of restrictions in the grantee's chain of title is unsupported by the case law and contrary to the Statute. Even at the time the Lakewood Subdivision was established in 1942 it is clear that creation of a valid restrictive covenant in Arkansas required there to be some form of instrument containing the restrictions available to the grantee, either in his deed or in a bill of assurance in his chain of title. The Statute codified the requirement and did not change this rule of property.

Nothing in subsequent Arkansas cases considering enforce-

ment of restrictive covenants leads us to conclude that this Court has contemplated any such change. *See generally, McGuire* v. *Bell*, 297 Ark. 282, 761 S.W.2d 904 (1988) (subsequent purchaser of land is charged with constructive notice of restrictions contained in every recorded deed in his chain of title; covenant enforced even though not in purchaser's deed); *Constant* v. *Hodges*, 292 Ark. 439, 730 S.W.2d 892 (1987) (upholding covenant in bill of assurance filed in 1949 supported by overwhelming evidence of a general plan of development). In fact the *McGuire* and *Constant* cases support the conclusion that there must be restrictions in the grantee's chain of title *and* a general plan of development before a restrictive covenant is enforceable. We so held when we refused to enforce a covenant which did appear in the grantee's deed, but the evidence presented showed no clear general plan in *Harbour* v. *Northwest Land Co.*, 284 Ark. 286, 681 S.W.2d 384 (1984). As the *Harbour* opinion makes clear, it is proper to consider whether a general plan of development exists when determining whether a written covenant or restriction contained in the chain of title of the party seeking to avoid the restriction remains valid. We have no case in which a restriction has been created as the result of a general development scheme.

■■ On appeal we try chancery cases *de novo* but do not reverse a finding of fact unless it is clearly erroneous. *McGuire* v. *Bell, supra*. Here the Chancellor erred on the law. As there were no restrictions in any instrument in Knowles' chain of title, there was no valid covenant effective against him. There was no basis for entry of the injunction. The decree is reversed and the case dismissed.

Reversed and dismissed.