REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND
No. 845
September Term, 2013

SCOTT SHADER, ET UX.

v.

HAMPTON IMPROVEMENT
ASSOCIATION, INC.

Hotten,
Nazarian,
Leahy,

JJ.

Opinion by Leahy, J.

Filed: June 26, 2014

Hampton is a residential community surrounding the grand Hampton Mansion and estate, a National Historic Site in Baltimore County. Since 1931, the Hampton community has been subject to restrictive covenants that operate mainly to limit residential density, preserve spacious lots, restrict development to single-family homes, and harmonize, to some extent, the appearance of homes and lots in the neighborhood. In 2004, Appellants Scott and Anna Shader ("the Shaders") reconfigured the lots underlying their property at 606 East Seminary Avenue in Hampton to create two separately addressed properties: 606 and 606A East Seminary Avenue. They ultimately filed a declaratory judgment action in the Circuit Court for Baltimore County against the Hampton Improvement Association ("HIA"), seeking a declaration that they were not prohibited from constructing a dwelling on 606A East Seminary Avenue because the HIA had waived by abandonment a restriction contained in Paragraph C of the covenants that precluded property owners from building more than one residential dwelling per lot, consistent with the original Plat filed in 1930. In the same action, the Shaders filed a motion for summary judgment raising offensive nonmutual collateral estoppel based on a prior judgment against the HIA in *Cortezi v. Duval Four-A, LLC*, No. C-07-02587 (Cir. Ct. Balt. Cnty. 2008) ("*Duval*"). The court denied this motion and, after a bench trial, found that the HIA did not waive the covenants and could enforce the restriction against 606A East Seminary Avenue.

The Shaders present two questions on appeal:

    I.      Did the lower court err in denying the motion for summary judgment

1

based upon the prior ruling in *Duval Four-A* in which it was held that the HIA had waived restriction of the one house per lot as lot was shown on the 1930 Plat by abandonment?

II.     Did the lower court err when it failed to declare that the one house per lot as lot was shown on the 1930 Plat had been waived by abandonment?

With regard to question one, we hold that the circuit court properly declined to apply offensive nonmutual collateral estoppel because the issues in *Duval* and the instant case are not identical and because application of offensive nonmutual collateral estoppel would be unfair to the HIA according to the precepts established by the Supreme Court in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979).  In response to question two, we hold that the circuit court was not clearly erroneous in finding that the HIA did not abandon Paragraph C of the covenants based on the evidence presented at trial, including testimony that the HIA has persistently enforced the restriction in dispute.  We therefore affirm the judgment of the Circuit Court for Baltimore County.

**BACKGROUND**

**A.  The Hampton Covenants**

Before it was a National Historic Site, the Hampton Mansion and estate was privately owned by the Ridgely family since the mid-1700s.[1]  In 1929, John Ridgely, Jr.

---

[1]

LYNNE DAKIN HASTINGS, A GUIDEBOOK TO HAMPTON NATIONAL HISTORIC SITE 19 (Margaret Worrall ed., 1986).  By way of background, Hampton originated in 1695 when Colonel Henry Darnall, a relative of Lord Baltimore, acquired the 1500-acre parcel constituting the Hampton property. *Id.* at 3.  In 1745, Colonel Charles Ridgely purchased the property from Colonel Darnall's heirs. *Id.* Charles Ridgely, Jr. later constructed a Georgian-style mansion from 1783 through 1790. *Id.* at 4, 7.  The mansion and the surrounding

2

established the Hampton Company and began developing a portion of the estate's land. The Hampton Company recorded Plat No. 1 of the Hampton community in 1930 ("1930 Plat").2  On April 6, 1931, the Company recorded a "Schedule of Restrictive Covenants and Easements" ("Covenants"), which specifies that its provisions "are to be a part of each Deed of any part of the land shown on [Plat No. 1] from the Hampton Company to any and every purchaser."  Paragraph C of the Covenants sets out the "Restrictions as to Use":

> The land included in said tract except as hereinafter provided shall be used for private residence purposes only and no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses each dwelling being designed for occupation by a single family and private garages for the sole use of the respective owners or occupants of the plots upon which such garages are erected there shall not be erected or maintained on said tract of land an apartment house or house designed or altered for occupation by more than one family and no more than one dwelling may be erected on a Lot.
> Buildings to be used for schools churches libraries art galleries museums clubs offices and studios or for recreative educational religious or philanthropic purposes may be erected or maintained in locations approved by the company.

The Covenants define "Lot" as "one unit of said tract as at present above by the recorded map of said tract" and "Building" as "one detached building."3  A "Plot" may

---

property remained in the Ridgely family until John Ridgely, Jr. sold the mansion and estate to the National Park Service, which assumed full administration in 1979. *Id.* at 21, 23.

2

    The Hampton Company later recorded Plats Nos. 2 and 3 along with corresponding restrictive covenants and easements substantially similar to the Covenants applicable to Plat No. 1.

3

    The Covenants do not set out the definition of a "dwelling"; however, in 1929, a "dwelling" was defined as "habitation; place or house in which a person lives; abode;

"consist of a single lot or more or less than a single lot."

Paragraph H concerns the duration of the Covenants and provides that the "restrictions[,] conditions[,] covenants[,] easements and agreements" shall run in perpetuity, provided, however:

> [T]hat at any time after December 31, 1960 any of the provisions contained in Paragraphs C D and K hereof may be cancelled or abrogated in whole or in part by the recording in the proper public Land Records of an appropriate instrument or instruments in writing executed by the then owners (not including mortgagees) of a majority in area of the land included in said tract exclusive of streets and other land then devoted to public use . . . .

In 1939, the Hampton Company recorded a revised version of Plat No. 1 that reconfigured lots 40, 42, and 44-54 ("1939 Plat"). The Company also recorded another revised version of Plat No. 1 in 1949 ("1949 Plat").

## B. The Shader Property

In 2002, the Shaders purchased the real property located at 606 East Seminary Avenue in Hampton from William and Theresa Valente. The property comprised two parcels: Lot 59, a 2.246-acre parcel, and the eastern portion of Lot 75, a 1.457-acre parcel north of Lot 59. Back in the late 1940s, the Hampton Company divided Lot 75 by conveying the 1.457-acre parcel to Raymond and Louise Moore who owned a contiguous property, Lot 59. A residential dwelling remains to this day on the balance of Lot 75. The deed conveying the 1.457-acre parcel from Lot 75 to the Moores ("1948 Moore Deed") provided:

> It is expressly covenanted and agreed as a part of the consideration for this

residence; domicile." WEBSTER'S NEW INTERNATIONAL DICTIONARY 687 (1929 ed.).

deed by the said Raymond L. Moore and Louise B. Moore his wife for themselves their heirs and assigns with the said The Hampton Company for itself its successors and assigns *that at no time shall any dwelling be erected on the lot hereby conveyed*.

(emphasis added). The 1948 Moore Deed also expressly incorporated the agreements and restrictions contained in the Covenants and stated that the Covenants were "binding upon . . . [the Hampton] Company its successors and assigns." In 1986, following Raymond Moore's death, the Valentes acquired the property.

The Shaders later decided to reconfigure the lots they purchased from the Valentes to create two separately addressed properties. On September 10, 2004, they executed two deeds that created two vertical properties with the addresses of 606 East Seminary Avenue, upon which the Shaders' home is located, and 606A East Seminary Avenue. The Shaders recorded the deeds in the Baltimore County Land Records in 2004.

In 2009, the Shaders listed their home on 606 East Seminary Avenue for sale and, at the same time, listed the 606A East Seminary Avenue property for sale as a buildable lot. In a letter dated September 21, 2009, copy of which was sent to Mr. and Mrs. Scott Shader, HIA President Eric Krali reminded the Shaders' listing agents of the restrictive covenants, including the prohibition against "the erection of more than one house per deeded lot, <u>as shown on the original Plat Map</u> at the time the property was recorded."

More than one year later, on February 4, 2011, the Shaders initiated a quiet title action against the Hampton Company (a defunct company) and its original incorporators, seeking to establish that the covenant in the chain of title for their portion of Lot

5

75—specifically, the covenant contained in the 1948 Moore Deed—was unenforceable.[4]

When no answer was filed, the court entered an Order of Default and thereafter a Judgment of Default declaring that the covenant in the 1948 Moore Deed was void.

### C. The Declaratory Judgment Action

On November 7, 2012, the Shaders filed a Complaint for Declaratory Judgment against the HIA in the Circuit Court for Baltimore County, seeking a declaration that the Covenants do not prohibit the building of a home on 606A East Seminary Avenue.

### 1. Plaintiffs Contend the HIA Is Collaterally Estopped from Enforcing the One-Dwelling-Per-Lot Restriction

The Shaders filed a motion for summary judgment on March 13, 2013, arguing that the circuit court should apply the doctrine of collateral estoppel based on the ruling in *Duval*.[5] The Shaders claimed that *Duval* precluded the HIA from re-litigating whether it waived Paragraph C of the Covenants by abandonment.

In *Duval*, the HIA and individual homeowners in Hampton filed an action for declaratory and injunctive relief against Duval Four-A, LLC ("Duval"), a property owner in the Hampton community. The HIA sued to stop construction of a dwelling on Duval's reconfigured lot and invoked the original configuration of the lot as it was shown on the 1930 Plat. The circuit court observed that the revised 1949 Plat "reconfigured the lot lines for several lots, and in fact, created Lot 4A, the lot owned by [Duval] and Lot 4B."

---

[4] The HIA was not a party to the action.

[5] The court denied the HIA's motion for summary judgment, in which the HIA argued that the statute of limitations had run on the Shaders' claim.

In its Order, the court included the following findings:

> 3. There is no evidence that any of the lot owners in Hampton ever objected to the construction of more than one house per lot as the lots were depicted on the 1930 Plat in these three other cases (Lots 18, 24, and 25). There is no evidence that the Hampton Improvement Association, Inc. ever objected. Neither the Plaintiffs, nor any of the other property owners in the subdivision sued or otherwise sought to enforce this interpretation of the covenant in these three situations, each of which involved lots oriented just adjacent to Lot 4A.

> 4. In addition, the testimony was undisputed that in some 30 instances in the subdivision, the Plaintiffs and their predecessors have permitted lot owners in Hampton to erect and maintain buildings other than single family dwellings and garages on their lots in violation of the very same covenant which they seek to enforce in this action.

(footnote omitted). The court determined that because "the Plat presently in effect portrays this Defendant's property as a separate lot, designated Lot 4A, the construction of Defendant's dwelling, as planned, will not frustrate the original intent or purpose of the covenants," which was to limit the density of homes in Hampton. Based on these findings, the court held that "the Plaintiffs and their predecessors, with regard to the proposed dwelling construction planned by the Defendant, have waived the right to seek to enforce the provisions of Paragraph C of the Covenants by abandonment" and that "Paragraph C of the Covenants does not preclude or prohibit construction of the dwelling contemplated by the Defendant, and the Defendant may construct a house on Lot 4-A." In a footnote, the court included the following instruction:

> The decision in this matter is limited to the facts of this case. This Court specifically does <u>not</u> conclude that the covenants are 'void.' This Court specifically does <u>not</u> conclude that the waiver defense would apply in any other action to enforce covenants in the future.

7

On April 10, 2013, a motions judge denied the Shaders' motion, stating:

First, I do not feel that "collateral estoppel" is able to be applied here. . . . [This doctrine] require[s] the placing of one face plate over another to see if the issues are the same and if the parties are fundamentally the same so as to be bound by a prior decision. There is nothing in the Shader motion that would allow me to see the face plate of the actual controversy before [the *Duval* court] and the decision by [the *Duval* court] as to the structures or buildings to which it refers as a violation of what covenant or issue presented. Second, the Response . . . makes an important distinction between the erection of houses as opposed to other sheds or buildings, the fact that there is argued not to have been an abandonment of covenants for Plat # 1, differences that may exist between the covenants, and application of the covenants as to different plats. That all means that a significant amount of additional facts needs to be gone through by the court before summary judgment or any judgment would be able to be entered.

A nonjury trial commenced on May 15, 2013, at which time the Shaders renewed their motion for summary judgment.6 During argument on the Shaders' motion, the HIA countered with a disparate case, arguing that the court must also consider the prior ruling in *Cully v. Hampton Improvement Ass'n, Inc.*, No. 91CG-655 90/284 (Cir. Ct. Balt. Cnty. 1992). Five years after purchasing Lot 10, a three-acre parcel in the Hampton subdivision, David and Carol Cully subdivided their lot to create Lot 10, a two-acre parcel upon which their home was located, and Lot 10A, a vacant one-acre parcel. The Cullys then sought permission from the HIA to construct a house on Lot 10A. When the HIA denied their request, the Cullys filed a declaratory judgment action in the Circuit Court for Baltimore County seeking a declaration that Paragraph C of the Covenants was void or waived. The Cullys argued, *inter alia*, that the construction of homes on nearby

---

6
     The court reserved its ruling until after the close of evidence, but ultimately held the matter *sub curiae*.

8

lots created by the revised 1939 Plat operated as a waiver of Paragraph C of the Covenants. In surveying the evidence adduced at trial, the circuit court found:

> There was testimony from a number of owners in the sub-division . . . that the Association always attempted to work with the home owners in matters involving such matters as fences and the enclosure of porches. They also testified that they were always careful to insist on prior approval for any major structural changes and they never permitted the building of an additional house on a lot. There was further testimony that the Architectural Committee is quite active and takes a flexible, practical approach to requests from members of the Association to make changes to their property.

Accordingly, the *Cully* court concluded that the HIA did not waive Paragraph C of the Covenants based on the testimony presented that the HIA continued to enforce the Covenants.[7] The court decided, therefore, that the Covenants prohibited the construction of a home on Lot 10A.

Returning to the matter at bar, following trial, the court denied the Shaders' motion for summary judgment in a Memorandum Opinion dated June 4, 2013.[8] The court recognized that Plaintiffs were invoking the doctrine of offensive nonmutual collateral estoppel by claiming that the prior ruling against the HIA in *Duval* estopped the Defendant HIA. The court concluded, however, that because the issues in *Duval* and the issues in the Shaders' action were not identical, the threshold requirement of collateral

---

[7] The court found that because the Hampton Company failed to obtain the consent of all of the lot owners, the agreement to revise the Hampton plat and modify the original covenants via the recordation of the 1939 Plat was void. The court concluded, however, that after more than 50 years, the equitable doctrine of laches would bar any party from challenging the construction of the existing homes on the lots created by the 1939 Plat.

[8] The Order and Opinion were entered on the docket on June 21, 2013.

9

estoppel was not met. Specifically, the court explained:

> While the issues are clearly related, the Shaders' property consists of one "original" lot and a portion of another lot that were joined in one parcel. The Shaders then sought to re-configure the lot line between these two parcels. In this manner, the Shaders argue that they have two buildable lots. [The court's] ruling in the Duval matter is specifically tied to a revision in the subdivision plat that was filed in 1949 that reconfigured some of the original lot lines and created at least two new lots, including Lot 4-A. [The court's] decision related narrowly to this portion of the Hampton subdivision . . . .

For these reasons, the court denied the Shaders' motion for summary judgment.

## 2. Plaintiffs Assert the HIA Abandoned Paragraph C of the Covenants

At trial, the Shaders argued that the existence of various buildings throughout the neighborhood demonstrated that the HIA had abandoned Paragraph C of the Covenants. Pictures exhibiting these structures were admitted into evidence. Mrs. Shader recounted, for example, that when she viewed 610 East Seminary Avenue, the property included a house, a pool house, and a guesthouse with two bedrooms, a living space, a kitchen, and a bathroom. Scott Shader provided similar testimony about observing violations of the Covenants; specifically, that "there are out buildings, there are detached garages, there are very large sheds, there are gazebos, there are guest houses." He had also observed violations of Paragraph D of the Covenants, which requires unattached garages to be within 50 feet of a residence.

The Shaders had counted on creating a separate lot; as Mrs. Shader explained, "we really believed . . . we would have the one piece of property to sell with the house and the other piece of property to sell for development or to put a house on so that would help us in our retirement." When asked during cross-examination whether she was told that the

10

Covenants existed, she stated, "I'm sure when we signed the paperwork at the round table and hundreds of papers are tossed at you, we signed something, yes." Mrs. Shader testified that the real estate agent and the information supplied by the Valentes, the previous owners, led her and her husband to believe that reconfiguration of the property would be possible.

Two HIA representatives also testified. Anna Von Lunz, a lifetime resident of Hampton and member of the HIA's architectural review committee, opined that the HIA, formed in the 1950s by John Ridgely, Jr., is a successor to the Hampton Company. She testified that the HIA has interpreted Paragraph C of the Covenants to prohibit more than one residential dwelling on one platted lot and that the purpose of the Covenants is to "protect[] the density and the character and the landscape of the community." Ms. Von Lunz explained that when homeowners planned to build on their property, the HIA would send a letter explaining the Covenants to the homeowners or their realtors. When asked what the HIA does with regard to the construction of a pool house or shed, Ms. Von Lunz explained that "it wasn't considered a second residential dwelling on a platted lot." She believed the residential character of the neighborhood has remained the same, stating that "[p]eople drive through that community just because of the pleasure of going through a community that has open spaces and homes that are well designed and fit on the lots and aren't overcrowded." When asked what would happen if the Covenants were abandoned, she responded that the result would "look like a downtown Towson subdivision" and "take all that open space away in front of the watershed."

Dwight Kines, the current president of the HIA, described the neighborhood as

11

"[l]arge lots, open spaces, quiet. It is a great place to live." He testified that the HIA has maintained and enforced the position that there can be no more than one residential dwelling per lot. When asked whether the structures identified by the Shaders violated Paragraph C, Mr. Kines answered "absolutely not . . . because none of these were dwellings, residential dwellings." He stated that "[t]he difference is that we are talking [about] a residential dwelling here and not a pool house or gazebo or a guest house or a garage." If the Covenants were no longer in force, he believed that "it would increase the density significantly."

After hearing all of the evidence presented at trial, the circuit court found that the "Hampton Company intended Paragraph C of the Covenants to be an enforceable restrictive covenant, to run with the land, and to create a uniform general scheme or plan of development." The court determined that the Shaders had constructive notice of the Covenants at the time they purchased the property, and noted that the covenant contained in the 1948 Moore Deed specifically prohibited the construction of a home on the conveyed eastern portion of Lot 75.[9] Finding the HIA did not waive Paragraph C of the Covenants by abandonment, the court explained:

> Although the Shaders were able to show numerous instances of violations based on the construction of separate structures on properties throughout the community, they were unable to demonstrate construction of a second residence on a single lot. Rather, the evidence demonstrates that the HIA has consistently taken action to enforce the restriction in the Covenants that requires "no more than one dwelling may be erected on a Lot."

9

Although not specifically noted in the court's Opinion, the 1948 Moore Deed also expressly incorporated the Covenants and stated that the Covenants were "binding upon . . . [the Hampton] Company its successors and assigns."

12

The court observed: "Maryland law holds that restrictive covenants may be abandoned in part without resulting in a wholesale abandonment of all restrictive Covenants," citing *King v. Waigand,* 208 Md. 308, 313 (1955). Accordingly, it determined that "violations of the portion of the covenant prohibiting the construction of buildings other than residential dwellings does [sic] not necessarily mean that the restriction on building more than one residence per lot has been abandoned." The court found that the evidence demonstrated the HIA has continually enforced the one-house-per-lot restriction, which has "allowed Hampton to remain a neighborhood of large, single family properties, with low population density."

The circuit court held that Paragraph C of the Covenants prohibits the construction of a home on 606A East Seminary Avenue. On June 28, 2013, the Shaders filed a timely notice of appeal.

## DISCUSSION

We first address whether the Shaders may raise the *Duval* decision in their declaratory judgment action to collaterally estop the HIA from litigating whether it waived Paragraph C of the Covenants by abandonment. After concluding that collateral estoppel does not apply, we explain why the circuit court did not err in refusing to declare that the HIA waived Paragraph C of the Covenants by abandonment.

### I.Collateral Estoppel

The Shaders contend the circuit court erred in denying their motion for summary judgment in which they argued the *Duval* judgment collaterally estopped the HIA from

13

defending against the allegation that it waived Paragraph C of the Covenants by abandonment. First, the Shaders claim that the issues in *Duval* and the underlying case are identical and that the circuit court erred in concluding they are not. Second, the Shaders argue the *Duval* decision mandated judgment in their favor under the doctrine of offensive nonmutual collateral estoppel. We disagree.

### A. Standard of Review

Although we generally apply an abuse of discretion standard when reviewing a circuit court's denial of a motion for summary judgment in favor of further proceedings, *Hous. Auth. of Balt. City v. Woodland*, No. 18, Sept. Term, 2013 (Md. App. Mar. 26, 2014), slip op. at 6 (citing *Metro. Mortgage Fund, Inc. v. Basiliko,* 288 Md. 25, 29 (1980)), this deferential standard of review does not extend to the court's post-trial denial of the Shaders' motion for summary judgment raising the legal issue of collateral estoppel. *See Presbyterian Univ. Hosp. v. Wilson*, 99 Md. App. 305, 313-15 (1994), *aff'd*, 337 Md. 541 (1995). We explain.

In *Basiliko, supra,* 288 Md. at 26, the Court of Appeals addressed the narrow question of whether an appellate court may review a denial of a pretrial motion for summary judgment other than for abuse of discretion. In this case, the Metropolitan Mortgage Fund sued the Basilikos for breach of written guaranty agreements. *Id.* Metropolitan filed three motions for summary judgment, which the circuit court denied. *Id.* at 26-27. After a bench trial, the circuit court concluded that the Basilikos did not sign the agreements and therefore entered judgment in the Basilikos' favor. *Id.* at 27. This Court affirmed, and the Court of Appeals granted certiorari to address the scope of

14

appellate review. *Id.* The Court explained that although a court "cannot draw upon any discretionary power to grant summary judgment," a court ordinarily has discretion to defer ruling on a pretrial motion for summary judgment until later in the proceedings or to deny the motion in favor of a trial on the merits, even if all technical requirements for summary judgment are met.10 *Id.* at 27-28 (citations omitted) (internal quotation marks omitted). The Court expounded:

> Thus, while . . . [the Maryland Rule for Summary Judgment] states that when a movant is entitled to judgment as a matter of law, the court should render judgment forthwith, this does not mean that entry of judgment may not be delayed until after a trial on the merits, should, in the court's mind, the promotion of justice require it. It is our view that an appellate court should be loath indeed to overturn, on a very narrow procedural ground, a final judgment on the merits entered in favor of the party resisting the summary judgment motion. . . . To turn the tables in this manner would be nothing short of substituting a known unjust result for a known just one.

*Id.* at 28-29 (internal citations omitted). The Court therefore held:

---

10

In *Commercial Union Insurance Co. v. Porter Hayden Co.*, 116 Md. App. 605 (1997), Judge Moylan, writing for this Court, discussed different scenarios in which a circuit court may decide to deny a motion for summary judgment. The most common denial would be based on the existence of a genuine issue of material fact necessitating resolution via submission to a trier of fact. *Id.* at 628-29. Another scenario would be one contemplated by *Basiliko*:

> In . . . [a] discretionary scenario, where the circumstances would permit the grant of summary judgment but where the judge chooses to deny the grant entirely or simply to defer it, two denouements are possible. The judge, in his discretion, might choose to submit the material factual issues to a jury (or engage in such fact finding himself) notwithstanding the literal absence of a genuine dispute. The judge might, on the other hand, choose to grant summary judgment at some later time in lieu of any further fact finding. The only inhibition would be that he not abuse his discretion.

*Id.* at 632.

[A] denial (as distinguished from a grant) of a summary judgment motion, as well as foregoing the ruling on such a motion either temporarily until later in the proceedings or for resolution by trial of the general issue, involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record; and we further hold that on appeal, absent clear abuse (not present in this case), the manner in which this discretion is exercised will not be disturbed.

*Id.* at 29; *see, e.g.*, *Woodland*, *supra*, slip op. at 6-7; *Dashiell v. Meeks*, 396 Md. 149, 164-65 (2006).

Later, in *Presbyterian University Hospital*, *supra*, 99 Md. App. at 313-15, this Court declined to extend the *Basiliko* holding to review a denial of a summary judgment motion that raised the purely legal issue of personal jurisdiction. In this case, the plaintiff filed a lawsuit against the defendant-hospital, located in Pittsburgh, PA, in the Circuit Court for Baltimore City. *Id.* at 309. The hospital filed a motion to dismiss for lack of personal jurisdiction, which the circuit court denied. *Id.* The court also denied the hospital's motion for summary judgment, again raising lack of personal jurisdiction. *Id.* at 310. The jury ultimately found in favor of the plaintiff, and the hospital appealed. *Id.* The plaintiff then filed a motion to dismiss the appeal, arguing that review of a denial of summary judgment after final judgment is prohibited or, alternatively, that review is limited to whether the court abused its discretion under *Basiliko*. *Id.* at 311. After reviewing the facts and holding of *Basiliko*, which we classified as a "garden-variety factual dispute," we concluded:

[I]t is clear that the reach of *Basiliko* is limited; it was intended to apply to those cases in which there are factual controversies—in which the ultimate results would be determined by resolution of facts. Where the material facts are genuinely disputed, summary judgment must be denied; where

16

they are not, the trial court in its discretion may still defer or deny a summary judgment motion. Where, however, a motion for summary judgment is based upon a pure issue of law that could not properly be submitted to a trier of fact, as such, to resolve, the conclusion in *Basiliko* that the denial of a summary judgment will not be reviewed on appeal is inapplicable. The trier of fact, whether it be a jury or a judge sitting in that capacity, could not determine the issue of personal jurisdiction, as raised in this case.

*Id.* at 311-14. Accordingly, we denied the motion to dismiss and identified the standard of review as "whether the trial court was legally correct." *Id.* at 315. The Court of Appeals affirmed:

We . . . agree with the Court of Special Appeals's recognition that to the extent that the issue of personal jurisdiction is a question of law, it is not properly submitted to the trier of fact to resolve. We therefore find nothing to preclude our review of the issue.

*Presbyterian Univ. Hosp. v. Wilson*, 337 Md. 541, 549 (1995).

Applying the rationales of *Basiliko* and *Presbyterian University Hospital* to the instant case, we find that it was within the motions court's discretion to deny the Shaders' motion for summary judgment before trial, and that it was also within the circuit court's discretion to defer, as it did, ruling on the motion until after the factual support for the motion came into full relief following trial. The Shaders' motion for summary judgment, however, raised the legal doctrine of collateral estoppel, and whether this doctrine should be applied is ultimately a question of law for the court. Therefore, we examine *de novo* the court's legal determination of whether collateral estoppel should apply based on the court's sustainable findings of fact.

B. **Identity of the Issues**

The doctrine of collateral estoppel precludes a party from re-litigating a factual

17

issue that was essential to a valid and final judgment against the same party in a prior action. *Welsh v. Gerber Prods., Inc.*, 315 Md. 510, 516 (1989). Maryland has adopted a four-pronged test that must be satisfied in order to apply collateral estoppel:

1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?
2. Was there a final judgment on the merits?
3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?
4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

*Pat Perusse Realty Co. v. Lingo*, 249 Md. 33, 45 (1968); *accord Wash. Suburban Sanitary Comm'n v. TKU Assocs.*, 281 Md. 1, 18–19 (1977). In this case, the first and third prongs of the test are at issue.

"[F]or the doctrine of collateral estoppel to apply, the probable fact-finding that undergirds the judgment used to estop must be scrutinized to determine if the issues raised in that proceeding were actually litigated, or facts necessary to resolve the pertinent issues were adjudicated in that action." *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 391–92 (2000) (citing *Burkett v. State*, 98 Md. App. 459, 466 (1993)). The Shaders contend that the issues in *Duval* are identical to the issues presented here. But the *Duval* case involved a lot—Lot 4-A—that was created more than 50 years prior by the Hampton Company as shown on the 1949 Plat. Accordingly, the circuit court distinguished *Duval* from the instant case:

> While the issues are clearly related, the Shaders' property consists of one "original" lot and a portion of another lot that were joined in one parcel. The Shaders then sought to re-configure the lot line between these two parcels. . . . [the court's] ruling in the *Duval* matter is specifically tied to a revision in the subdivision plat that was filed in 1949 that reconfigured

18

some of the original lot lines and created at least two new lots, including Lot 4-A. [The court's] decision related narrowly to this portion of the Hampton subdivision , and he found that the HIA had abandoned its right to seek to enforce any Covenant to restrict construction of a dwelling on Lot 4-A. However his Memorandum Opinion expressly noted that it did not involve a broad determination of the viability of the covenants within the subdivision. . . . Under these circumstances, there are subtle but distinct differences between the issues addressed in the Duval decision and those presented in this matter. . .

Underscoring the circuit court's conclusion that the issues decided in both cases were not identical was the *Duval* court's declaration that its ruling was limited to the case before it.11 We find that the circuit court correctly determined that the issues presented in *Duval* and the case *sub judice* were not identical.

### C.    Mutuality of Parties and the Doctrine of Offensive Nonmutual

---

The *Duval* court made what appear to be two legally incongruous rulings: first, that the HIA waived Paragraph C by abandonment; and second, that the court's ruling applied only to the *Duval* property and not to any other future action to enforce the Covenants. As will be discussed *infra*, "[w]aiver by abandonment concerns violative uses of the land subject to a restrictive covenant carried out by covenantors other than the one sought to be enjoined." *City of Bowie v. MIE Props., Inc.*, 398 Md. 657, 698 n.27 (2007) (emphasis omitted). In other words, when a party asserts the defense of waiver by abandonment, the focus is not on the party-covenantor and his particular lot, but on *other* covenantors and other lots. Therefore, the *Duval* court's holding—that the HIA waived Paragraph C by abandonment *only as to the lot owned by Duval*—was an inaccurate application of the case law governing waiver by abandonment. Another way the *Duval* case could be viewed, however, is that because waiver is an equitable defense, the court applied equitable principles to bar the HIA from enforcing the Covenants against Duval's property because Lot 4A was created more than a half century earlier by the Hampton Company, the HIA's predecessor in interest. *See, e.g., Speer v. Turner*, 33 Md. App. 716, 728 (1976)

("'[E]stoppel rests upon a detrimental change of position induced by the acts or conduct of the party estopped.'" (quoting *Gould v. Transamerican*, 224 Md. 285, 295 (1961))). Our ultimate decision on collateral estoppel in this case obviates any need for us to opine definitively on the correctness of the *Duval* court's ruling, which, in any event, is a circuit court decision that does not bind this Court or other circuit courts.

### Collateral Estoppel

The Shaders argue that their use of nonmutual collateral estoppel should not be considered offensive, given that their position is defensive in nature, or, alternatively, that this Court is permitted to and should apply the doctrine of offensive nonmutual collateral estoppel in this case. The question, then, is whether a plaintiff in an action for declaratory judgment, often a posture that is substantively defensive, may raise the claim of nonmutual collateral estoppel and if so, whether the claim considered defensive or offensive. In accordance with *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)*, Burruss v. Board of Commissioners of Frederick County*, 427 Md. 231 (2012), and *Culver v. Maryland Insurance Commissioner*, 175 Md. App. 645 (2007),[12] we hold that regardless of whether the action is one for declaratory judgment, a plaintiff who invokes nonmutual collateral estoppel against a defendant does so offensively, and may proceed so long as raising the prior case against the defendant(s) in the action does not offend the *Parklane* factors.

Traditionally, collateral estoppel required a mutuality of parties; that is, "in a second suit *between the same parties* . . . any determination of fact, which was actually litigated in the first case, is conclusive in the second case." *Sterling v. Local 438*, 207 Md. 132, 140-41 (1955) (emphasis added) (citing *Le Brun v. Marcey*, 199 Md. 223, 226 (1952)), *cert. denied*, 350 U.S. 875 (1955). Over time, courts have modified the mutuality requirement in order to apply collateral estoppel when one or both of the parties

---

12

   Discussed *infra*.

were neither a party nor in privity with a party in the previous litigation. *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 322 (1971); *Pat Perusse Realty Co., supra,* 249 Md. at 36–40. The Court of Appeals has cautioned:

> This principle [of nonmutual collateral estoppel] . . . is almost as simple in concept as it is difficult in application. Conceptually, there will be instances in which a party who has had the benefit of a full and fair adjudication of an issue should be bound by that adjudication, even in a subsequent proceeding involving a different party. The difficulty is, however, that there are many situations where application of the doctrine of nonmutual collateral estoppel would be manifestly unfair.

*Welsh, supra*, 315 Md. at 517.

A party can invoke nonmutual collateral estoppel either offensively or defensively. "Offensive use of nonmutual collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against a different party," whereas "[d]efensive use of nonmutual collateral estoppel occurs when a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against a different party." *Id.* at 517 n.6 (citing *United States v. Mendoza*, 464 U.S. 154, 159 n.4 (1984)). Courts have not applied offensive nonmutual collateral estoppel as willingly as defensive nonmutual collateral estoppel.

In *Parklane Hosiery Co.*, *supra*, 439 U.S. at 329–31, still the leading case on point, the Supreme Court identified several reasons (hereinafter "*Parklane* factors") why courts should treat offensive and defensive nonmutual collateral estoppel differently. First, as a matter of judicial economy, defensive collateral estoppel incentivizes plaintiffs to join in the first action, whereas offensive collateral estoppel does not. *Id.* at 329–30. "Since a

21

plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." *Id.* at 330. Second, offensive nonmutual collateral estoppel may be unfair to the defendant for several reasons: (1) "[i]f a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable;" (2) "the judgment relied upon as a basis for the estoppel [may be] inconsistent with one or more previous judgments in favor of the defendant;" and (3) "the second action [may] afford[] the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 330–31. The Supreme Court concluded:

> The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Id.* at 331.

Maryland courts have embraced the Supreme Court's rationale in *Parklane*. *See Rourke v. Amchem Prods., Inc.*, 384 Md. 329, 349–50 (2004); *Burruss v. Bd. of Cnty. Comm'rs of Frederick Cnty.*, 427 Md. 231, 252 (2012). In *Rourke*, the Court of Appeals first discussed the offensive use of nonmutual collateral estoppel, albeit briefly, in the context of applying full faith and credit to a Virginia judgment. *Rourke*, *supra*, 384 Md. at 349–51. In doing so, the Court noted that Maryland had not yet formally applied offensive nonmutual collateral estoppel and recapitulated *Parklane*'s analysis of the

22

doctrine. *Id.* at 349–50. In applying full faith and credit to a Virginia judgment, the Court of Appeals was required to apply Virginia law, which had not adopted offensive nonmutual collateral estoppel. *Id.* at 350–52. Accordingly, the Court held that collateral estoppel could not be applied because there was no mutuality of the parties. *Id*. at 352.

In *Burruss*, *supra*, 427 Md. at 241, 244, the Board of County Commissioners of Frederick County appointed a nine-member charter board to draft and present a charter to Frederick voters pursuant to Article XI–A, § 1A of the Maryland Constitution. The petitioners submitted a petition, purportedly signed by 2,915 registered voters, seeking Board membership via special election. *Id.* at 244. The Board declined to hold a special election after concluding that the petition did not contain a sufficient number of valid signatures under section 6-203 of Maryland's Election Law Article. *Id.* The petitioners then filed a petition for judicial review in the Circuit Court for Frederick County, seeking a declaratory judgment regarding the correct legal standard for determining the validity of petition signatures. *Id*. at 244–45. The petitioners argued that the circuit court should apply offensive nonmutual collateral estoppel based on a prior ruling in the Circuit Court for Anne Arundel County that adopted the legal standard advanced by petitioners. *Id*. at 245. The circuit court affirmed the Board's decision, declining to apply offensive nonmutual collateral estoppel because it found that the issues were not identical and there was no mutuality of the parties. *Id*. at 245–46. Before this Court heard the case, the Court of Appeals granted certiorari. *Id*. at 238–39. The Court of Appeals determined that offensive nonmutual collateral estoppel was not permissible under the circumstances. *Id*. at 252. Applying the *Parklane* factors, the Court concluded that the Circuit Court for

23

Anne Arundel County's ruling was inconsistent with prior Court of Appeals' rulings and that "[i]t would be unfair to bind Respondents to an incorrect interpretation of the law, as determined by another trial court, that could have been, and should have been, interpreted correctly by that trial court." *Id*.

The application of offensive nonmutual collateral estoppel was affirmed by this Court in the context of an administrative appeal in *Culver v. Maryland Insurance Commissioner*, 175 Md. App. 645 (2007). In *Culver*, the Maryland Insurance Administration ("MIA") revoked the defendant's insurance producer's license. *Id.* at 649. When the defendant sought to challenge the revocation, the MIA moved for summary disposition, arguing that a prior Court of Appeals decision, in which the Court disbarred the same defendant for various ethics violations, established that the defendant was untrustworthy and, therefore, the defendant could not satisfy statutory licensing requirements.13 *Id.* at 649–50. The presiding administrative law judge concluded that the prior decision precluded the defendant from re-litigating the Court's factual findings and issued a recommendation to that effect. *Id.* at 650–51. The MIA adopted the judge's recommendations and issued a final revocation order. *Id.* at 651. On appeal, the Circuit Court for Baltimore City affirmed. *Id.* This Court also affirmed after applying the *Parklane* factors and finding that the possible detriments of offensive nonmutual

---

13

     Sections 10-126(a)(2), 10-126(a)(3), 10-126(a)(13), and 10-126(f) of the Insurance Article of the Maryland Code (2003 Repl. Vol.) contained the relevant licensing requirements. Section 10-126(a)(13) stated that a Commissioner could deny a license to an applicant if the applicant had "otherwise shown a lack of trustworthiness or incompetence to act as an insurance producer."

24

collateral estoppel articulated in *Parklane* and reiterated in *Rourke* were not present. *Id.* at 656–57. The MIA, as a regulatory body for insurance licensing, was not a plaintiff "seeking a windfall without any work." *Id.* at 656. Preclusion also would not be unfair to the defendant because (1) the defendant had the opportunity to defend his prior case vigorously; (2) the Court of Appeals decision was not inconsistent with other prior decisions; and (3) the MIA hearing would not provide the defendant with procedural protections that could have led to a different result. *Id.*

The Shaders argue that although they are the plaintiffs in this action, their use of nonmutual collateral estoppel should not be considered offensive in the context of a declaratory judgment action when their claim is substantively defensive in nature. Instead of proactively seeking a judicial determination of their rights, the Shaders emphasize that they could have commenced the construction of a dwelling or the sale of 606A East Seminary Avenue as a buildable lot and awaited the HIA's eventual lawsuit against them. If the Shaders had taken the latter route, their use of collateral estoppel would have been defensive. In *Burruss*, *supra*, the underlying action involved a petition for judicial review that sought a declaratory judgment. 427 Md. at 237. The Court of Appeals applied the *Parklane* factors in deciding whether *offensive* nonmutual collateral estoppel was appropriate, without ruling specifically whether the doctrine applies in declaratory judgment actions generally.14

---

14

      It does not appear that the petitioners argued that their use of collateral estoppel should not be considered offensive. *See id.* at 239 n.8.

Other state courts have opined on whether a plaintiff's use of collateral estoppel in a declaratory judgment action should be treated as offensive or defensive. In *Mann v. Old Republic National Title Insurance Co.*, 975 S.W.2d 347, 349 (Tex. App. 1998), Old Republic National Title Insurance Co. ("Old Republic") filed a declaratory judgment action against Mann, seeking a determination that Mann was excluded from coverage under Old Republic's title insurance policy based on his knowledge of the easements existing on the property he purchased.15 Old Republic then filed a motion for summary judgment, arguing that a prior judgment imputed Mann with knowledge of the easements and was therefore binding on this issue. *Id.* The trial court granted the motion. *Id.* On appeal, Mann argued that the trial court erred in applying offensive nonmutual collateral estoppel without considering the *Parklane* factors. *Id.* at 351. The Court of Appeals of Texas disagreed on the basis that Old Republic's initiation of the declaratory judgment action after receiving a claim from Mann was defensive in nature. *Id.* As a result, the court viewed Old Republic's position as plaintiff to be "insignificant" and held that Old Republic's defensive use of collateral estoppel did not require the trial court to consider *Parklane* factors. *Id.*; c*f. Burlington Nat'l R.R. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1228–29 & n.4 (3d Cir. 1995) (looking to the structural essence of the case to determine whether a party's use of nonmutual collateral estoppel is offensive or

---

15

The insurance policy did not cover "either loss or damage caused by any easements on the purchased land disclosed by a physical inspection, or encumbrances known to the insured, not shown by public records and not known to the company." *Id.* at 348. When Mann purchased the subject property, there were two unrecorded easements on the property. *Id.*

defensive); *Aetna Cas. & Surety Co. v. Jones*, 220 Conn. 285 (1991) (concluding that use of offensive nonmutual collateral estoppel in a declaratory judgment action is a "hybrid form of collateral estoppel," but concluding that there is no "formalistic delineation" between offensive and defensive collateral estoppel).

Other courts have determined that a plaintiff's use of nonmutual collateral estoppel in a declaratory judgment action remains offensive in nature. In *American Family Mutual Insurance Co. v. Savickas*, 193 Ill.2d 378, 381–82 (2000), American Family Mutual Insurance Co. ("American Family") filed a declaratory judgment action against Savickas, the insured, seeking a determination that it was not required to defend or indemnify Savickas in a wrongful death action when Savickas had already been convicted of murder. The trial court granted summary judgment in favor of American Family based on collateral estoppel. *Id.* at 382. The Supreme Court of Illinois concluded that American Family's use of collateral estoppel was "technically offensive." *Id.* at 390. The court expounded:

> [W]e note that although this case does fit the technical definition of "offensive" collateral estoppel, in that the plaintiff is seeking to estop the defendants, a declaratory judgment action is somewhat different in nature than most lawsuits. Rather than the plaintiff attempting to obtain redress for a past wrong, the plaintiff in a declaratory judgment action simply seeks construction of a governmental regulation or written instrument and a declaration of the rights of the parties involved. In this suit, American Family is attempting to determine its obligations in advance in order to preempt a subsequent suit in which it would be named defendant. It is debatable whether this case should be treated as one involving "offensive" collateral estoppel.

*Id.* at 390–91 (citations omitted). Despite this hesitancy, the court held that even if the court were to consider American Family's use of collateral estoppel as offensive, the

27

application of nonmutual collateral estoppel to the facts of that case would not raise the concerns identified in *Parklane*; therefore, the court affirmed the trial court's ruling. *Id.* at 391.

We recognize that the Shaders' preemptive use of nonmutual collateral estoppel in this declaratory judgment action is distinguishable from a typical litigation action. We are not persuaded, however, that this distinction should alter our classification of the Shaders' use of collateral estoppel as offensive. Based on our reading of *Burruss, Rourke, Welsh*, and *Culver*, the labeling of nonmutual collateral estoppel as offensive or defensive is not dispositive as to whether collateral estoppel will be applied; rather, a plaintiff's assertion of nonmutual collateral estoppel prompts an evaluation of whether the concerns articulated in *Parklane* are present. Applying the rationale of the Court of Appeals in *Burruss*, Maryland courts may apply offensive nonmutual collateral estoppel in a declaratory judgment action, but only if the concerns identified in *Parklane* are not present. *See Burruss*, *supra*, 427 Md. at 252 (declining the opportunity to apply offensive nonmutual collateral estoppel specifically to the facts of that case based on unfairness to the defendants); *see*, *e.g.*, *Savickas*, *supra*, 193 Ill.2d at 391. Consideration of *Parklane* factors serves as an important additional safeguard against a potentially unjust application of nonmutual collateral estoppel. *See Welsh, supra*, 315 Md. at 517 (noting that "there are many situations where application of the doctrine of nonmutual collateral estoppel would be manifestly unfair").

Applying the *Parklane* factors to this case, we begin by stating that we do not view the Shaders' use of nonmutual collateral estoppel as an impediment to judicial economy.

28

The HIA contends that the Shaders waited to file their case until almost five years after the filing of *Duval* with the hope that *Duval* would result in a favorable judgment. Given that Duval Four-A, LLC was the *defendant* in *Duval*, we are not persuaded that the Shaders were waiting to see whether another plaintiff's action would be successful without shouldering any of the work. *See Parklane*, *supra* 439 U.S. at 330; *Culver*, 175 Md. App. at 656 (concluding that the plaintiff was not "seeking a windfall without any work"). To the contrary, we find the Shaders' filing of this action to promote judicial economy by seeking a declaration of their rights before constructing a home on 606A or selling 606A as a buildable lot. We encourage parties to ascertain their rights before engaging in conduct that risks violating obligations or restrictions.

We do, however, believe that the application of offensive nonmutual collateral estoppel would be unfair to the HIA under the facts presented. First, it would be unfair to bind the HIA to an inaccurate interpretation of the law. *See Burruss*, *supra*, 427 Md. at 252. The *Duval* court's holding—that the HIA waived Paragraph C by abandonment *only as to the lot owned by Duval*—was an inaccurate application of the case law governing waiver by abandonment.[16] "Waiver by abandonment concerns *violative uses of the land* subject to a restrictive covenant carried out by *covenantors* other than the one sought to be enjoined." *City of Bowie v. MIE Props., Inc.*, 398 Md. 657, 698 n.27 (2007). In other words, when a party asserts the defense of waiver by abandonment, the focus is not on the

---

[16]

      *See supra* footnote 11. We believe, however, that the court reached an accurate resolution of the case via the application of equitable principles to bar the HIA from enforcing the Covenants against Duval's property as it was depicted in the 1930 Plat.

29

party-covenantor and his particular lot, but on *other* covenantors and other lots.

Second, it is also possible that the HIA lacked an incentive to appeal because the *Duval* court limited its ruling to the facts in *Duval* and specified that his judgment would not apply in future actions to enforce the covenant. The Supreme Court recognized in *Parklane* that parties may have little incentive to defend in cases involving nominal damages or cases in which future suits are not foreseeable. *Parklane, supra*, 439 U.S. at 330. As an illustration, the Court cited the case of *Berner v. British Commonwealth Pacific Airlines, Ltd.*, 346 F.2d 532 (2d Cir. 1965), for an example of when the "application of offensive collateral estoppel [was] denied where defendant did not appeal an adverse judgment awarding damages of $35,000 and defendant was later sued for over $7 million." *Parklane*, *supra*, 439 U.S. at 330.

Third, the application of collateral estoppel would also be unfair because the *Duval* court's ruling is inconsistent with the *Cully* court's ruling. In *Cully*, the court considered whether the construction of dwellings on the lots created by the revised 1939 Plat constituted an abandonment of Paragraph C. The *Cully* court evaluated this evidence, as well as the testimony at trial that the HIA never permitted the construction of more than one house per lot, and found that the HIA did not waive the restriction. In *Duval,* the court considered whether the construction of more than one dwelling on three lots, as those lots were depicted in the 1930 Plat, and the erection of structures other than houses and garages constituted an abandonment of Paragraph C. The *Duval* court evaluated this evidence and found that the HIA waived Paragraph C by abandonment. In our view, both courts considered evidence of more than one dwelling per lot *as lots were delineated on*

*the 1930 Plat* and reached opposite conclusions.  Applying the *Parklane* factors to this case, therefore, we find that the circuit court correctly refused to apply the *Duval* decision to collaterally estop the HIA from defending against the allegation that it waived by abandonment the restriction precluding property owners from building more than one residential dwelling per lot as delineated on the 1930 Plat.

## II. Waiver

Maryland Rule 8-131(c) governs our review of a circuit court's ruling on declaratory relief after a nonjury trial.  *MBC Realty, LLC v. Mayor & City Council of Balt.*, 192 Md. App. 218, 233 (2010).  Rule 8-131(c) states:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence.  It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

To this end, "we must consider the evidence in the light most favorable to the prevailing party and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence."  *MIE Props., Inc.*, *supra*, 398 Md. at 676-77 (quoting *Colandrea, supra*, 361 Md. at 393–94 (citations omitted)).  We review issues of law decided by the circuit court *de novo* based on the court's sustainable findings of fact, *id.,* but "whether waiver has occurred is a question of fact . . . which is reviewed for clear error."  *Id.* at 699 (internal citations omitted).

### A. Interpretation of the Covenants

During trial, the parties presented different interpretations of the purpose of the Covenants.  The Shaders urged that Paragraph C of the Covenants was intended to

31

preclude the construction of any building whatsoever other than a single-family dwelling or garage on each lot. Pointing to the existence of structures other than dwellings or garages on various properties throughout Hampton, the Shaders argued that the overall purpose of the Covenants—to maintain a certain appearance in Hampton—had been abandoned. The HIA, on the other hand, argued that the purpose of Paragraph C of the Covenants, which it duly enforced, is to limit residential density by precluding the building of more than one residential dwelling on each lot.

In the seminal case of *Belleview Construction Co. v. Rugby Hall Community Ass'n*, 321 Md. 152, 157–58 (1990), the Court of Appeals stated:

> In construing covenants, "[i]t is a cardinal principle . . . that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself." The language of the instrument is properly "considered in connection with the object in view of the parties and the circumstances and conditions affecting the parties and the property . . . ." This principle is consistent with the general law of contracts. If the meaning of the instrument is not clear from its terms, the circumstances surrounding the execution of the instrument should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources."

(citations omitted). The Court later provided:

> As with contracts generally, a covenant is ambiguous if its language is susceptible to multiple interpretations by a reasonable person. "An ambiguity does not exist simply because a strained or conjectural construction can be given to a word." The first step is to "[d]etermine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated," and if "the language of the contract is plain and unambiguous there is no room for construction."

*Dumbarton Imp. Ass'n v. Druid Ridge Cemetery Co.*, 434 Md. 37, 53–54 (2013) (citations omitted). Extrinsic evidence should only be considered "when the intent of the parties

and the purpose of a restrictive covenant cannot be divined from the actual language of the covenant in question, necessitating a reasonable interpretation of the language in light of the circumstances surrounding its adoption." *MIE Props., Inc.*, *supra*, 398 Md. at 681. If the court's consideration of extrinsic evidence fails to shed light on its analysis, the court should apply the rule of strict construction in favor of free alienability and use of land. *Id.* (citing *Belleview Constr. Co.*, *supra*, 321 Md. at 158).

We conclude that Paragraph C of the Covenants is not ambiguous as a matter of law. The intention of the parties and purpose of Paragraph C is clear: to restrict the use of each lot in Hampton to residential, single-family purposes. Even if Paragraph C was ambiguous, the circuit court was not clearly erroneous in its factual finding as to Paragraph C's purpose. The circuit court heard testimony from the President of the HIA and a member of the HIA's architectural review committee that Paragraph C's purpose was to preserve the residential density and character of the neighborhood. We afford great deference to the circuit court's factual findings, and based on the evidence presented at trial, we do not find clear error.

### B. Waiver by Abandonment

Waiver is a long-recognized defense to the equitable enforcement of restrictive covenants. *MIE Props., Inc.*, *supra*, 398 Md. at 679. Waiver may occur either by acquiescence, which involves "a covenantee abiding the violative actions of the covenantor," or by abandonment, which involves "the covenantee abiding the violative actions of others besides the covenantor defendant which are taken as also waiving impliedly violative actions of the covenantor defendant." *Id.* (citing *Kirkley v. Seipelt*,

212 Md. 127, 136 (1957)). A covenant will not be enforced if the original plan of improvement has been abandoned. *Kirkley*, *supra*, 212 Md. at 135 (citing TIFFANY ON REAL PROPERTY § 587 (abridged ed. 1940)). "The question of whether there has been such an abandonment is in each case a question of fact and must be established by evidence clear and unequivocal of acts of a decisive nature." *Lindner v. Woytowitz*, 37 Md. App. 652, 658 (1977).

As a threshold matter, we note that parties often conflate the standard for determining waiver by abandonment and the standard for determining a covenant's continued validity in light of changed relevant circumstances in the neighborhood. The latter standard is applied where a party challenges the enforceability of a restrictive covenant when "there has been 'deterioration in the residential character of the neighborhood or a failure from the beginning of the restricted development, so that the restrictions no longer served their intended purpose.'" *Chevy Chase Vill. v. Jaggers*, 261 Md. 309, 316 (1971) (quoting *Texas Co. v. Harker*, 212 Md. 188, 196–97 (1957)). The inquiry in this context is "whether there has been a complete or radical change in the neighborhood causing the restrictions to outlive their usefulness." *Id.* (citations omitted). Although this standard and the standard for waiver by abandonment share similarities, the Court of Appeals clarified the differences between the two in *MIE Props., Inc.*, *supra*, 398 Md. at 698 n.27. Specifically, the two standards are distinguished by "where the inconsistent use is taking place and by whom." *Id.* "[T]he change in circumstances standard often involves changes to the surrounding neighborhood of the subject land that are inconsistent with the covenant's restrictions, but are neither carried out on the subject

34

land itself, nor by any covenantor," whereas "[w]aiver by abandonment concerns *violative uses of the land* subject to a restrictive covenant carried out by *covenators* other than the one sought to be enjoined." *Id.* Because the circuit court in the case *sub judice* did not highlight this distinction, we do so now. We further note that the court did not find that the residential character of the neighborhood had so radically deteriorated as to render the covenants invalid.

In support of their waiver by abandonment argument, the Shaders first maintain that the evidence produced at trial demonstrated that the HIA waived the restriction against more than one dwelling per lot as shown on the 1930 Plat. The Shaders, as the party seeking to prove waiver, bore the burden of proof. *MIE Props., Inc.*, *supra*, 398 Md. at 699 (citing *Canaras v. Lift Truck Servs., Inc.*, 272 Md. 337, 361 (1974)). The Shaders first point to the *Duval* court's factual findings that more than one house existed on several lots as those lots were delineated on the 1930 Plat and emphasize that the HIA did not dispute these findings in this case. A circuit court, however, is not generally bound by another circuit court's rulings, s*ee, e.g., Nat'l Liberty Ins. Co. of Am. v. Thrall*, 181 Md. 19, 22-23 (1942), and the record does not reflect that the Shaders introduced evidence of these violations beyond merely citing to the court's findings in *Duval*. At trial, the Shaders personally testified about witnessing violations of Paragraph C's prohibition against the erection of any building other than a dwelling or garage. These violations consisted of pool houses, guest houses, gazebos, sheds, and unattached garages. The only testimony to support the existence of more than one house per lot was Mrs.

Shader's description of the "guesthouse" on 610 East Seminary Avenue and Mr. Shader's reference to the findings in *Duval*.

On behalf of the HIA, two representatives testified that the purpose of Paragraph C was to restrict the residential density of Hampton and that the HIA has enforced Paragraph C to ensure that only one residential house is located on each lot. The President of the HIA testified that he did not consider sheds and garages to be in violation of Paragraph C's one-dwelling-per-lot restriction. The circuit court concluded, "[a]lthough the Shaders were able to show numerous instances of violations based on upon the construction of separate structures on properties throughout the community, they were unable to demonstrate construction of a second residence on a single lot." Instead, the circuit court found that the "the evidence demonstrate[d] that the HIA has consistently taken action to enforce the restriction in the Covenants that requires 'no more than one dwelling may be erected on a Lot.'"

The Shaders also argue that the court cannot permit the selective enforcement of covenants; in other words, the court cannot allow the HIA to abandon the restriction against the erection of buildings other than dwellings and garages, but enforce the restriction against more than one house per lot. The Shaders cite two out-of-state cases in support of this position: *Johnstone v. Bettencourt*, 195 Cal. App. 2d 538 (Cal. Dist. Ct. App. 1961); *Moore v. Adams*, 141 S.W.2d 46 (Ark. 1940). Both cases are unpersuasive. Neither case addresses whether a restriction contained in a set of covenants is severable.

As accurately noted by the circuit court, the Maryland Court of Appeals has ruled that restrictions in a set of covenants may be severable. In *King v. Waigand*, 208 Md.

36

308, 309 (1955), the defendants operated a store licensed to sell beer and wine in the Riverdale Park subdivision. When the defendants later obtained a license to begin selling spirituous liquor, plaintiffs sought to enjoin the defendants based on a restrictive covenant applicable to the subdivision, which provided:

> That no blacksmith or other shop, no manufactory of any kind, no livery stables, pig pen, or bone boiling or similar establishment shall be erected or permitted on said lots. *That no spirituous or malt liquors shall be made, sold or kept for sale upon said premises*; that no nuisance or offensive, noisy or illegal trade, calling or transaction shall be done, suffered or permitted thereon, and that no part of said premises shall be so used or occupied as to injuriously affect the use, occupation or value of the adjoining or adjacent premises for residence purposes, or the neighborhood wherein said premises are situated. * * * And any breach or threatened breach of this covenant may be enjoined upon the application of said grantor, their successors or assigns (assigns shall include any person deriving title to any lot in said Riverdale Park from the grantors), and said grantors, and their successors shall also have the right to recover the sum of $1,000.00 as liquidated damages for every breach. These covenants are to be taken and construed as running with the land.'

*Id.* at 310–11 (emphasis added). The defendants argued that the plaintiffs waived their right to enforce the covenant because other establishments in the subdivision had sold malt liquor and wine. *Id.* at 310. The chancellor granted the injunction on the ground that "an abandonment of the restriction against malt liquors does not necessarily mean an abandonment of the restriction against spirituous liquors." *Id.* at 311. On appeal, the Court of Appeals first noted that "[t]he obvious purpose of the covenant was to prevent any establishments or activities that might detract from the subdivision as a residential area." *Id.* at 312. On the issue of whether the covenant was severable, the Court concluded:

37

> Th[e] restriction is in the disjunctive. The distinction between 'spirituous liquors' and 'malt liquors' is perfectly clear and commonly known. We hold that the restriction is severable. 'Spirituous liquors' and 'malt liquors' are not synonymous terms.

*Id.* at 313. Other jurisdictions have reached similar conclusions. *See Dauphin Island Prop. Owners Ass'n v. Kuppersmith*, 371 So. 2d 31, 34 (Ala. 1979) ("[W]e hold that any failure of the Association to enforce the two-tie pilings restriction did not constitute estoppel by acquiescence to assert either the height and roof restrictions or the building permit restriction."); *Swaggerty v. Petersen*, 280 Or. 739, 746 (1977) ("Assuming that plaintiffs were, or should have been, aware of [numerous violations of the restrictions elsewhere in the subdivision] . . . and failed to object to them does not preclude them from suing to enforce the density restrictions. The right to enforce one restrictive covenant is not lost by acquiescence in the violation of another restriction." (citations omitted)); *see also* 9 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 60.10[1] (2000) ("Acquiescence in the violation of one restriction does not constitute acquiescence in the violation of a different restriction unless the violation defeats the object of the entire plan." (footnote omitted)).

The circuit court here correctly concluded that the "restrictive Covenants may be abandoned in part without resulting in a wholesale abandonment of all restrictive Covenants." Although the 1931 Covenants lack punctuation, the first paragraph of Paragraph C technically comprises four independent clauses, and each serves as a restriction. For visual clarity, we have separated the clauses as follows:

1. The land included in said tract except as hereinafter provided shall be used for private residence purposes only and

2. no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses each dwelling being designed for occupation by a single family and private garages for the sole use of the respective owners or occupants of the plots upon which such garages are erected

3. there shall not be erected or maintained on said tract of land an apartment house or house designed or altered for occupation by more than one family and

4. no more than one dwelling may be erected on a Lot.

The final clause provides the definitive construct of the paragraph: that each lot is restricted to no more than one family home, as "dwelling" was defined to apply to one's domicile or residence at the time the Covenants were drafted.17 The first clause instructs that the use must be private, and the third clause clarifies that the use is for single family occupancy. The second clause, which defines the acceptable appurtenances for each single family dwelling, is the clause that the circuit court found was violated due to evidence of additional buildings, such as sheds, gazebos and pool houses on various lots in Hampton. Permitting the HIA to expand the concept of garage or building does not destroy the purpose of Paragraph C, so long as these buildings are appurtenant to and for the use of one single family dwelling. For this Court to hold that the abandonment of one restriction in Paragraph C results in the abandonment of all restrictions would be inequitable.18 Hampton could lose its aesthetic character and low residential density, as

---

17
     *See supra* footnote 3.

18
     Indeed, other portions of these Covenants are void and unenforceable. For example, Paragraph B of the Covenants, entitled "Absolute Restrictions," states, in part,

     At no time shall the land included in said tract or any part thereof or any building erected thereon be occupied by any negro or person of negro

homeowners would be able to subdivide their lots and construct multiple dwellings and units to the limits of applicable zoning regulations. This would defy the clear intent of Paragraph C of the Covenants: to restrict the use of each lot in Hampton to residential, single-family purposes. As the Court of Appeals has instructed, we "'are under a duty to effectuate rather than defeat an intention which is clear from the context, the objective sought to be accomplished by the restriction and from the result that would arise from a different construction.'" *MIE Props., Inc., supra*, 398 Md. at 680 (quoting *Belleview Construction Co., supra*, 321 Md. at 157-58). Therefore, we hold that the circuit court did not err in concluding that the HIA did not waive the restriction prohibiting more than one house per lot, consistent with the original Plat filed in 1930.

**JUDGMENT AFFIRMED;**
**COSTS TO BE PAID BY APPELLANTS.**

---

extraction This prohibition however is not intended to include the occupancy by a negro domestic servant or other person while employed in or about the premises by the owner or occupant of any land included in said tract.

Obviously State courts cannot enforce these covenants if requested to do so, as the enforcement of such restrictions would violate the Equal Protection Clause of the Fourteenth Amendment, which establishes "equality in the enjoyment of basic civil and political rights" and preserves "those rights from discriminatory action on the part of the States based on considerations of race or color." *Shelley v. Kraemer*, 334 U.S. 1, 20–21, 23 (1948). The unenforceability of this restriction does not render the balance of the restrictions unenforceable so long as they are legal, reasonable, and viable. *See, e.g., Viking Props., Inc. v. Holm*, 155 Wash.2d 112, 122–24 (2005) (en banc) (finding that a decades-old covenant barring racial minorities from land ownership was severable from the density limitation providing that only one dwelling may be on each one-half acre).